UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 07-60548-CIV-COHN/SELTZER

CHRISTINE W. TROOP,

          Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of
Social Security,

          Defendant.
_____/

## REPORT AND RECOMMENDATION TO DISTRICT JUDGE

I.    INTRODUCTION

THIS CAUSE is before the Court on the cross-motions for summary judgment [1] filed,

respectively, by Plaintiff Christine Troop ("Claimant") and by Defendant Michael Astrue,

Commissioner of Social Security ("Commissioner").  The motions were referred to United

States Magistrate Judge Barry S. Seltzer pursuant to Magistrate Rules 1(c) and (d), Local

Rules of the United States District Court for the Southern District of Florida.

The cross-motions present the following issue:  whether there exists substantial

evidence to support the determination by the Administrative Law Judge ("ALJ") that

Claimant remains capable of performing past relevant work and, therefore, is not entitled

---

[1] Although other circuits have found the summary judgment device inappropriate for deciding cases under the Social Security Act, see, e.g., Igonia v. Califano, 568 F.2d 1383, 1389 (D.C. Cir. 1977), the Eleventh Circuit has deemed it appropriate where the district court has reviewed the record and based its judgment on a finding of substantial evidence in the administrative record. See Lovett v. Schweiker, 667 F.2d 1, 2 (5th Cir. 1981).

to a period of disability or Disability Insurance Benefits under the Social Security Act. The undersigned concludes that substantial evidence does support the ALJ's determination. Accordingly, the undersigned RECOMMENDS that Claimant's Motion for Summary Judgment (DE 20) be DENIED, that Defendant's Motion for Summary Judgment (DE 25) be GRANTED, and that the Commissioner's decision be AFFIRMED.

## II.    PROCEDURAL HISTORY

Claimant applied for disability insurance benefits on July 13, 2001; she alleged that she became disabled as of December 6, 2000. Tr. 103-04, 152. The application was denied initially and upon reconsideration. Tr. 103-06, 124-25. Claimant requested and was granted a hearing before an ALJ, which was held on December 14, 2004. Tr. 58-76. On February 4, 2005, the ALJ issued his decision, finding that Claimant was not under a "disability" as defined in the Social Security Act at any time through the date of the decision. Tr. 109-16. Claimant requested review of the ALJ's decision, and on December 2, 2005, the Appeals Council granted her request; it vacated the hearing decision and remanded the case to the ALJ for further consideration. Tr. 147-51. On February 9, 2006, the ALJ conducted a second hearing. Tr. 77-102. And on June 6, 2006, the ALJ again rendered an unfavorable decision, finding that Claimant was "not disabled" as defined in the Social Security Act. Tr. 25-41. On February 12, 2007, the Appeals Council denied Claimant's request for review of the ALJ's 2006 decision. Tr. 11-13.

On April 16, 2007, Claimant filed a Complaint (DE 1) commencing the instant action; on April 4, 2008, the Commissioner filed an Answer (DE 17). On April 29, 2008, Claimant filed her Motion for Summary Judgment (DE 20), and on June 17, 2008, the Commissioner

2

filed Defendant's Motion for Summary Judgment with Supporting Memorandum of Law (DE 25). Pursuant to the undersigned's order, on June 20, 2008, the Commissioner submitted a Supplemental Statement of Facts (DE 27). And pursuant to another order, on July 25, 2008, the Commissioner submitted a Response to Order Directing Supplemental Briefing (DE 29).

The matter is now ripe for review.

III.   FACTS

The undersigned has reviewed Defendant's Supplemental Statement of Facts (DE 27) and finds that it fairly and accurately summarizes the relevant portions of the administrative record.   The undersigned herein has excised the facts that pre-date the onset of Claimant's disability and the summaries of the physicians' opinions that are not pertinent to this Court's decision.[2]

Plaintiff's Disability Claim

In her application filed on July 13, 2001, Plaintiff alleged that she was born in 1956 and became disabled on December 6, 2000, at age 44 (Tr. 152). In her Disability Report dated July [4][3], 2001, Plaintiff said that she was disabled because of depression, herniated cervical disks, frequent migraine type headaches, and neck, shoulder, arm, and hand pain (Tr. 164). She had completed two years of college-level education (Tr. 170) and had worked as a credit analyst and as a telephone customer service representative (Tr. 165, 173-75). In her Reconsideration Disability Report dated January 7, 2002,

---

[2] See Defendant's Supplemental Statement of Facts at 2-26 (DE 27) for a more comprehensive statement of the record.

[3] The undersigned has found some minor errors in the Commissioner's Supplemental Statement of Facts and has bracketed the corrections thereto. The undersigned has also inserted footnotes where appropriate to supplement the factual statement.

Plaintiff alleged that her condition was worse and that she had carpal tunnel syndrome (CTS) and TMJ (Tr. 181).

. . . .

On October 4, 2001, Wendy Silver, Psy.D., examined the record and opined that Plaintiff did not have a severe mental impairment (Tr. 392-405). She opined the Plaintiff had no difficulties in maintaining social functioning, only mild difficulties with activities of daily living and in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation (Tr. 402). Dr. Silver provided a narrative report (Tr. 404).[4]

. . . .

On October [10], 2002, Dr. Ouellette examined Plaintiff who complained of continued numbness and pain in both hands (Tr. 348-49). Plaintiff had bilateral CTS which had resolved on the left but the right was still painful and repeat nerve conduction studies showed some evidence of carpal tunnel on the right (Tr. 348).

On October 30, 2002, Lola C. Jorge, M.D., examined the record and opined that Plaintiff could perform light work (Tr. 438-45). She should only use her hands occasionally (Tr. 441).[5]

On November 16, 2002, Narendra H. Patel, M.D., J.D., performed an independent psychiatric examination of Plaintiff at the request of the State agency (Tr. 446-48). Plaintiff's appearance and presentation were unremarkable except that she showed limited movement of her neck (Tr. 446). Plaintiff reported that she had been depressed since the 1980s and had been through many "depressive cycles" (Tr. 446). Her primary care physician had prescribed Paxil for three years in the early 1990s and she had also tried Elavil, Wellbutrin, Prozac, Zoloft, and Effexor (Tr. 446). She had been on Pamelor for the last two years with fairly good results

---

[4] The undersigned notes that Dr. Silver's 2001 opinion is Exhibit 10F, a Psychiatric Review Technique Form. Tr. 392-405.

[5] The undersigned notes that Dr. Jorge's 2002 opinion is Exhibit 15F, a Physical Residual Functional Capacity Assessment. Tr. 438-45.

(Tr. 447). Plaintiff had about two good days a week (Tr. 447). She had a 10-year-old son but reported that her marriage was nonexistent, with financial problems, no sex for two years, and her husband had to work two jobs (Tr. 447). Dr. Patel's provisional diagnosis was major depression, chronic, recurrent, and moderate (Tr. 448). Her prognosis was guarded, fair at best, as her depression was only partially treated due to side effects from antidepressants if used at the optimal dose (Tr. 448). In addition, she reported chronic pain, neurological deficits in her hands, cervical spine fusion, and multiple other medical problems (Tr. 448). Plaintiff reported that she was independent in caring for her personal needs, but she needed help with cooking, cleaning, laundry, grocery shopping, and lifting heavy objects (Tr. 448). She occasionally played games on the computer or read (Tr. 448). Plaintiff had no difficulty with concentration during the evaluation and had adequate ability of task persistence (Tr. 448). She had shown deterioration in her work and non-work settings due to her multiple problems (Tr. 448).

On November 18, 2002, Joel A. Coplowitz, M.D., examined Plaintiff at the request of the State agency (Tr. 449-51). Plaintiff reported that she was able to do light activities of daily living such as light cooking, cleaning, and food shopping (Tr. 449). She could lift 10 to 20 pounds (Tr. 449). Her physical examination was unremarkable except for limited cervical spine range of motion (Tr. 450). Plaintiff's neurological examination was unremarkable with no evidence of difficulty with memory or thought disorder (Tr. 450). Her manual dexterity was normal and she had no difficulty turning the doorknob, grasping a pen, or handling change (Tr. 450). Tinel's sign was negative bilaterally (Tr. 450). Her muscles had normal bulk, tone, and strength (Tr. 450). She had no difficulty getting on or off the examining table or in changing from a lying to a sitting position (Tr. 450). Dr. Coplowitz's impressions were spinal stenosis status post cervical fusion and history of bilateral carpal tunnel (Tr. 451).

On November 26, 2002, Dr. Landess saw Plaintiff for [a] follow-up (Tr. 483-85). Plaintiff reported continuing severe neck pain which got worse as the day progressed (Tr. 483). She reported numbness in both upper extremities (Tr. 483). There was no evidence of atrophy of loss of muscle strength

5

in any extremity (Tr. 484).  Dr. Landess referred Plaintiff for three weeks of physical therapy, three times a week, including massage, neuromuscular stimulation, electrical TENS device, hot packs, and exercises (Tr. 485)

On December 9, 2002, M.I. Figueredo, Ph.D., examined the record and completed a Psychiatric Review Technique form (PRTF) (Tr. 452-65). Dr. Figueredo opined that Plaintiff would have mild mental restrictions in her activities of daily living; mild difficulties with maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation (Tr. 462). Dr. Figueredo provided his notes (Tr. 464).[6]

On December 9, 2002, Dr. Figueredo also completed a Mental Residual Functional Capacity Assessment (Tr. 466-69).  His summary conclusions were that Plaintiff would not be significantly limited in 17 of 20 areas of mental functioning (Tr. 466-67). He opined that she would have moderate limitations in the areas of carrying out detailed instructions; maintaining attention and concentration for extended periods, and in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances (Tr. 466).  Dr. Figueredo opined that Plaintiff had the ability to understand, remember, and perform simple, repetitive tasks in a routine setting (Tr. 468). She had adequate social skills, but lacked motivation to socialize due to her physical health difficulties (Tr. 468).   Plaintiff had adequate adaptive functioning to handle basic skills, but would have difficulty coping with stress (Tr. 468). Overall, Dr. Figueredo opined that Plaintiff could perform simple tasks in a routine setting with minimal social demands (Tr. 468).[7]

On December 17, 2002, Dr. Landess ordered repeat nerve conduction studies (Tr. 470-82) They revealed electrical evidence of right CTS with sensory involvement (Tr. 482). An EMG of the upper extremities was normal (Tr. 470).

---

[6] The undersigned notes that Dr. Figueredo's 2002 Psychiatric Review Technique form is Exhibit 18F.  Tr. 452-65.

[7] The undersigned notes that Dr. Figueredo's 2002 Mental Residual Capacity Assessment is Exhibit 19F.  Tr. 466-69.

6

On May 21, 2003, Dr. Eismont saw Plaintiff who reported continued frequent headaches (Tr. 524-33). She also reported pain in her neck, especially posteriorly and toward her shoulders, especially on the right (Tr. 524). Plaintiff reported a stabbing pain down into her hands bilaterally (Tr. 524). She complained of lower back pain down the back of her right upper leg (Tr. 524). X-rays revealed a solid fusion with some degenerative changes appropriate to her age (Tr. 525, 528-29). Dr. Eismont agreed with her current medications and told Plaintiff to remain as active as possible within the limits of her pain (Tr. 525).

. . . .

On December 9, 2003, Dr. Landess saw Plaintiff who complained of a throbbing headache once a week with nausea but no vomiting (Tr. 576). Her strength was 5/5 in all extremities with no atrophy noted (Tr. 574). Sensory examinations were normal (Tr. 573). She had decreased cervical and lumbar spine range of motion with trigger point areas in the neck and lower extremities (Tr. 573). Dr. Landess advised Plaintiff not to do heavy pushing, pulling, or lifting over 15 pounds (Tr. 572). She referred Plaintiff for physical therapy and/or chiropractic treatment[,] and she referred Plaintiff for pain management to Dr. Andrew Frank (Tr. 572).

. . . .

On June 29, 2004, Dr. Landess saw Plaintiff who reported migraine type headaches, once or twice a week, with nausea but no vomiting (Tr. 566). She also complained of neck and lower back pain (Tr. 566). There was no loss of strength and there was no atrophy in any extremity (Tr. 564). Plaintiff's sensory examinations were within normal range (Tr. 563). Dr. Landess advised Plaintiff not to do heavy pushing, pulling, or lifting over 15 pounds (Tr. 562). Dr. Landess opined that Plaintiff was unable to work at that time (Tr. 562).

On October 19, 2004, Dr. Eismont commented that he was seeing Plaintiff approximately four years following a one-level anterior and posterior discectomy and fusion at C3-C4 (Tr. 522-23). Plaintiff reported similar pains with frequent headaches, burning radiating down her arms, back pain, and

right leg pain (Tr. 522). Her worst pain was pain in the back of her neck (Tr. 522). She reported that chiropractic evaluation and manipulation were helping [8] (Tr. 522). Plaintiff walked into the examining room with normal balance (Tr. 522). Her reflexes were 2+ and symmetric at the biceps, brachioradialis, and triceps (Tr. 522). Upper extremity strength was normal bilaterally from her deltoids down through the intrinsic muscles of her hands (Tr. 522). Hoffman signs were negative bilaterally (Tr. 522). Knee reflexes were 2+ bilaterally and ankle reflexes were 2+ on the right and trace on the left (Tr. 522). X-rays revealed a solid fusion from C3 through C7 with no evidence of instability on flexion and extension x-rays (Tr. 522). Dr. Eismont advised Plaintiff that he agreed with her current medications and he had nothing else to recommend for her pain (Tr. 523). She did not need to return for follow-up (Tr. 523).

On December 2, 2004, Dr. Landess saw Plaintiff who reported continued weekly headaches, neck pain and spasms, hand numbness, burning jaw pain, and difficulty with pushing, pulling, walking, and overhead reaching (Tr. 557-61). Her neurological examination was unremarkable except for decreased pinprick in the fingertips and a positive Tinel's sign in the left median nerve (Tr. 558, 560). Dr. Landess observed no atrophy or loss of strength in Plaintiff's extremities (Tr. 559). She had decreased flexion, extension, and lateral rotation in the cervical and lumbar spine with moderate pain and spasm (Tr. 560). Plaintiff had positive trigger points in the cervical area (Tr. 560). Lasegues test and foramina compression tests were positive bilaterally (Tr. 560). Dr. Landess advised Plaintiff not to do heavy pushing, pulling, or lifting over 20 pounds (Tr. 561). Dr. Landess opined that Plaintiff was unable to work due to her multiple medical conditions (Tr. 561).

On July 14, 2005, Dr. Landess saw Plaintiff who reported pain in her upper extremities and hands, lower back pain, neck pain and spasms, and headache with nausea two times per week (Tr. 612). All extremities had 5/5 strength and there was no atrophy (Tr. 613). Dr. Landess advised Plaintiff not to do

---

[8] The record includes progress notes from Leo B. Stouder, chiropractor, for the period July 11, 2003, through December 1, 2004, averaging approximately three visits a month during that period (Tr. 536-54).

heavy pushing, pulling, or lifting over 15 pounds (Tr. 614).

On January 11, 2006, Dr. Landess saw Plaintiff who reported that for a few months she had been having neck pain, jaw pain, and pain all over her body (Tr. 608). She complained of throbbing headaches occurring three to four times a week, neck pain, hand numbness, lower back pain, depression, and difficulty with pushing, pulling, and lifting (Tr. 608). General examination revealed that Plaintiff was well nourished and in no acute distress (Tr. 608). Her mental status examination appeared to be unremarkable (Tr. 609). Her extremity strength was 5/5 and she had no atrophy (Tr. 610). She had decreased range of motion in the cervical and lumbar spine and positive trigger points in the cervical area (Tr. 611). Dr. Landess advised Plaintiff not to do heavy pushing, pulling, or lifting of over 20 pounds and opined that she was unable to do repetitive hand work or computer work (Tr. 611).

On February 7, 2006, H. Barry Miller, M.D., was asked to complete a Psychological Questionnaire (Tr. 622). Dr. Miller wrote that he had seen Plaintiff only in connection with treatment for her son and in family therapy and in extensive phone contact (Tr. 622). He had seen her medical records and his diagnosis was major depression per historical data (Tr. 622). Dr. Miller declined to answer a number of questions more definitively until he had formally evaluated her (Tr. 625).

On October 14, 2006, an MRI of Plaintiff's cervical spine revealed the extensive prior surgery with no residual or recurrent disk herniation seen and no spinal stenosis (Tr. 615). There were mild disc bulges at C2-3 and C7-[T]1 without central spinal stenosis, a small area of likely myelomalacia in the spinal cord at approximately C5, and likely disk bulging or disk protrusion at T4-[5] without central spinal cord impingement seen (Tr. 616).

December 14, 2004 Hearing Testimony

Plaintiff's representative reported that Plaintiff's attorney was continuing to pursue her claim for long term disability benefits from MetLife (Tr. 62). Plaintiff testified that her last name was Walezak-Troop (Tr. 65). She was 48 years old and resided with her 12.5-year-old son and her husband (Tr. 66). Plaintiff

9

drove herself to the hearing (Tr. 66). She had an Associate's Degree in mathematics and had worked toward a Bachelor's Degree (Tr. 67-68). Plaintiff denied that she did any gardening or yard work (Tr. 69). Two or three times a week she did light exercises with one-pound weights for her neck and shoulders (Tr. 70). Plaintiff testified that she typically gets up between 6:30 AM and 7:00 AM, gets her son up, gives her son breakfast, and either she or her husband drive the son to school (Tr. 70). When she returns, she usually goes back to bed (Tr. 70). If it is a bad day and she has a migraine, she will stay in bed three or four hours (Tr. 70). When her son returns from school, Plaintiff oversees his homework (Tr. 70). Sometimes she uses take-out food for dinner; sometimes it is frozen dinners heated in the microwave (Tr. 70). After a brief cleanup, she watches television, reads, and goes to bed between 10:30 PM and 11:00 PM (Tr. 70). Plaintiff testified that she could not do any work because of muscle spasm, migraines, and occasional low back pain (Tr. 71). She alleged that she could walk about a block, stand about 10 minutes, and sit 15 to 20 minutes without a significant problem (Tr. 71). Plaintiff testified she did not lift more than a gallon of milk (Tr. 72). Activities that aggravate her condition included writing, holding a pencil, using a mouse, and holding her arms out for typing (Tr. 72). Lying down helps relieve her pain (Tr. 72). Her headaches occurred weekly and lasted from one to four days (Tr. 73). She had surgery on her neck in 1993, 1994, and 2000, and surgery on her hands in 2002 (Tr. 73). Plaintiff said she had numbness, nerve pain, and sharp stabbing pains in her wrists and hands (Tr. 73). She denied being able to button a button and said she could write only for a very short time (Tr. 73-74). Plaintiff testified that her migraine medication made her sleep and her nerve medication made her gain weight (Tr. 74). She had suffered from depression since the 1980s and her only treatment currently was medication (Tr. 74-75).

February 9, 2006 Hearing Testimony

When asked about ongoing care, Plaintiff testified that she saw Dr. Eismont more than a year ago and was scheduled to see him the following month[,] and she saw Dr. Landess twice a year to get her medications (Tr. 82-83). Plaintiff testified that she gets her son up to go to school and then may do some

10

light cleaning (Tr. 85). If she is not able to do anything that day, she goes back to bed after her son gets home from school (Tr. 85). If the pain eases up after a couple of hours, she may get up and think about dinner (Tr. 85). She has neck pain and shooting pains down her arms, in addition to some lower back pain (Tr. 85). Lying down is the most helpful and she takes medication (Tr. 86). Her medication is muscle relaxers, antidepressants, and arthritis medication and "this combination seems to be working" (Tr. 86). Her doctors did not want her on pain medications (Tr. 86). She could walk a block or two, stand in place 10 minutes, and sit 10 to 15 minutes (Tr. 87-88). Plaintiff complained of electrical pains shooting down her arms (Tr. 88). Sensation in her hands was decreased[,] and she dropped things and had difficulty unscrewing the top off a medication bottle (Tr. 89-90, 99). She could carry 7-10 pounds but did not carry anything heavier than a gallon of milk (Tr. 88-89). Her husband carried heavier items (Tr. 89). She had received disability benefits from her employer but they were stopped (probably in 1995) (Tr. 91). Plaintiff testified that she had little movement in her neck and she got a migraine two to three times a week, lasting on average 1.5 days but could last up to three days (Tr. 98). When her neck muscles start to spasm it pulls on her eyes and on her jaw[] (Tr. 99). Plaintiff testified that she feels her arm problems are a result of the neck surgeries and not from CTS (Tr. 100). She also planned to see Dr. Miller for individual counseling (Tr. 101).

<u>Miscellaneous Exhibits</u>

On November 14, 2001, in connection with her attempt to get long term disability benefits through her employer, Plaintiff underwent a vocational assessment (Tr. 211-1[5]) by Gary R. Fannin, a vocational assessment specialist (Tr. 216-22). Based on a review of medical records and an interview with Plaintiff, Mr. Fannin opined that Plaintiff had not been able to perform her own job as a credit analyst since December 2000 (Tr. 215).

The record includes MetLife's December 28, 2001, six-page consideration and denial of Plaintiff's appeal of the denial of her attempt to obtain long-term disability benefits from her employer (Tr. 628-33). It includes summaries of the medical

and other evidence considered. The decision includes the definition of disability under the insurance plan:

> You are considered totally disabled and eligible to apply for LTD Benefits Plan benefit[s] if, during the six-month waiting period and the first two years that benefits are payable, you are unable to perform any and every duty of your own occupation due to a medically determined physical or mental impairment caused by sickness, disease, injury or pregnancy (Tr. 628).

On January 7, 2002, Plaintiff completed a Reconsideration Disability Report in which she complained of neck, shoulder, arm, and hand pain; debilitating migraines; weakened arms and hands; difficulty with concentration and handwriting; and depression (Tr. 181). She reported that she was unable to clean or cook much and had difficulty dealing with her son who had ADHD (Tr. 181). Her hands ached and her neck and shoulders were stiff and achy (Tr. 181). Plaintiff reported that she was unable to spend a lot of effort on her personal care so she cut her hair short, did not wear make up, did not clean or polish her shoes, did not iron clothes, and had difficulty shaving, cutting her toe nails, bending over, and scrubbing her back in the shower (Tr. 183). She required assistance with cleaning, cooking, and shopping (Tr. 183).

A December 2006 Case Development report of phone contact with Plaintiff reflects the caller's impression that Plaintiff's condition has been consistent for 20 years (Tr. 1[8]7). She reported her pain started when she suffered whip lash in a motor vehicle accident when she was 17 years old (Tr. 186).

Defendant's Supplemental Statement of Facts at 1, 11-12, 16-26 (DE 27).

IV.   STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, the court's role is a limited one. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's findings of fact must be affirmed if they are based upon "substantial

evidence." Id.; Richardson v. Perales, 402 U.S. 389, 401 (1971). "Substantial evidence" is evidence that a reasonable person would accept as adequate to support the challenged conclusion. Richardson, 402 U.S. at 401; Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982). The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." Bloodsworth, 703 F.2d at 1239. In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards. Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

V.    ANALYSIS

    A.    The Sequential Evaluation

A "disability" is defined as an inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). In determining the merits of a claim for benefits, the court must consider the evidence as a whole, including:  (1) objective medical facts or clinical findings;  (2) diagnoses of examining physicians;  (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other witnesses; and (4) the claimant's age, education, and work history. Walden, 672 F.2d at 839.

To arrive at a determination as to disability, the ALJ must undertake the sequential evaluation embodied in 20 C.F.R. § 404.1520. This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful employment.

20 C.F.R. § 404.1520(b).  If so, a finding of "no disability" is made.  Id.

     If the claimant is not engaged in such work, then the ALJ must proceed to the second step and determine whether the claimant suffers from a "severe impairment."  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  If a severe impairment is not found, the ALJ will conclude that there is no disability; if a severe impairment is determined, the ALJ will proceed to the next phase of the analysis.  Id.

     The third step requires the ALJ to determine whether the claimant's impairment meets or equals those listed in Appendix I of the Regulations.  20 C.F.R. § 404.1520(d). If so, the ALJ will find the claimant disabled without considering age, education, and work experience.  Id.  If not, the inquiry will proceed to the next stage.

     Step four requires the ALJ to determine whether the claimant has the "residual functional capacity" to perform past relevant work.  20 C.F.R. § 404.1520(e).  The Regulations define "residual functional capacity" as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1).  This determination takes into account "all the relevant evidence," including medical evidence, the claimant's own testimony, and the observations of others.  Id.  The ALJ must then compare the residual functional capacity to the demands of the previous employment to determine whether the claimant is still capable of performing that type of work.  If so, the claimant is found not disabled.  20 C.F.R. § 404.1520(e).

     If the claimant establishes an inability to return to past relevant work, the burden shifts to the Commissioner to demonstrate that there exists other substantial gainful

employment in the national economy that the claimant can perform. Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); Smith v. Schweiker, 646 F.2d 1075, 1077 (5th Cir. Unit A 1981). If the Commissioner points to possible alternative employment, the burden returns to the claimant to prove an inability to perform those jobs. Id. These shifting burdens comprise the fifth and final step, at which point the ALJ must resolve whether the claimant is actually capable of performing other gainful and substantial work within the economy. 20 C.F.R. § 404.1520(g)(1).

To help evaluate whether there exist sufficient jobs that can be performed given the claimant's age, education, and physical limitations, the Commissioner has promulgated Medical Vocational Guidelines. See 20 C.F.R. § 404, Subpt. P, App. 2. The Guidelines may be applied where a claimant is not performing substantial gainful activity and is prevented by a severe, medically determinable impairment from doing past relevant work. 20 C.F.R. § 404.1569. The Guidelines are composed of detailed grids and rules which, based on a claimant's residual functional capacity, age, education, and previous work experience, direct a finding of disabled or not disabled. See Walker, 826 F.2d at 1002.

Yet, the Guidelines "do not cover all possible variations of factors" and are inapplicable "if one of the findings of fact about the person's vocational factors and residual functional capacity is not the same as the corresponding criterion of the rule." 20 C.F.R. § 404.1569. The Guidelines, therefore, are not applicable where the claimant is unable to "perform the full range of work required of that category on a daily basis." Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991). Further, they may not be used when the claimant suffers from non-exertional limitations, such as mental impairments. Hargis, 945

F.2d at 1490; Walker, 826 F.2d at 1003. When the Guidelines may not be conclusively applied, they may serve only as a framework to determine whether sufficient jobs exist within the claimant's range of residual functional capacity. Hargis, 945 F.2d at 1490. In such instances, the Commissioner must instead carry his burden through the use of a vocational expert. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); Wingo v. Bowen, 852 F.2d 827, 831 n.4 (5th Cir. 1988); Walker, 826 F.2d at 1003. A vocational expert provides the ALJ with a realistic appraisal of the work a claimant is capable of performing. Walker, 889 F.2d at 50.

B.     Application of the Sequential Evaluation by the ALJ

After considering all of the evidence, the ALJ concluded that Claimant was capable of returning to her past relevant work and, therefore, was "not disabled" under the Social Security Act. Tr. 40-41. In arriving at this conclusion, the ALJ addressed each step in the evaluative sequence.[9]

The ALJ first found that Claimant had not engaged in substantial gainful activity at any time relevant to his decision. Tr. 30. The ALJ next found that "[C]laimant has the following severe impairment: status post cervical fusion." Tr. 30. Yet, the ALJ also found that Claimant's alleged mental impairments are "not 'severe,'" as nothing in the record showed that her "mental problems interfered with [] [C]laimant's daily activities or social functioning." Tr. 30-33. Additionally, the ALJ did not find Claimant's carpal tunnel

---

[9] Preliminarily, the ALJ observed that Claimant met the insured status requirements of the Act as of her alleged onset date of December 6, 2000, and that she had acquired sufficient quarters of coverage to remain insured through December 31, 2005. Tr. 28, 30. Accordingly, the relevant period for analysis is the five-year period between December 6, 2000, and December 31, 2005.

syndrome to be severe.  Tr. 33.  The ALJ then found that "[C]laimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404 . . . ."  Tr. 33.

The ALJ proceeded to assess Claimant's residual functional capacity ("RFC").  In arriving at the RFC finding, the ALJ considered the credibility of Claimant's statements regarding her impairments and the "extent of their impact on her ability to do any work activities at all."  Tr. 40.  The ALJ found that Claimant's assertions were "not entirely credible" as they "were inconsistent with other evidence, and the overall evidence did not persuasively establish excess pain or greater limitations."  Tr. 40.  Then, after carefully considering the entire record, the ALJ found that Claimant is capable of performing "a full range of light work activities"; she could "lift up to 20 pounds with frequent lifting or carrying of up to 10 pounds; stand or walk, off and on, for 6 hours of an 8-hour day; and sit for up to six hours in an 8-hour day."[10]  Tr. 33-34.

---

[10] The Code of Federal Regulations defines "light work" as:

> [work involving] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Finally, after weighing Claimant's residual functional capacity against the requirements of her previous work, the ALJ found that Claimant remains "capable of performing past relevant work as a credit analyst and telephone customer service representative." Tr. 40. Accordingly, the ALJ concluded that "[C]laimant has not been under a disability, as defined in the Social Security Act." Tr. 41.

C.   Discussion

Claimant disputes the findings and conclusions of the ALJ. She argues that the ALJ erred in the following respects:  (1) by misreading evidence to which he gave substantial weight; (2) by not finding Claimant's depression to be severe; (3) by not considering all of Claimant's impairments in combination; (4) by not explaining the weight he gave to the findings of the State Agency medical consultant; and (5) by failing to consider Claimant's non-severe impairments in assessing her residual functional capacity. See Claimant's Motion at 5-13 (DE 20). For the reasons set forth below, the undersigned does not find Claimant's arguments persuasive and addresses each as part of the discussion.

1.   ALJ Properly Found Claimant's Depression Was Not Severe

Claimant first disputes the ALJ's determination that Claimant's depression was not severe. See Claimant's Motion at 5-10 (DE 20). In disability determinations, the burden is on the claimant to show that her impairments are "severe," as that term is defined under the law. See McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). The Code of Federal Regulations defines a severe impairment as one that "significantly limits your physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c).

When assessing the severity of a claimant's mental impairment, the Code of

18

Federal Regulations offers even more precise guidance. The Code requires that an ALJ evaluate the four areas of function listed in 20 C.F.R. §404.1520a(c)(3): (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. Tr. 32. When rating the degree of limitation in the first three areas of function, the ALJ must employ a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). When rating the degree of limitation in the fourth area of function, the ALJ must employ a four-point scale: none, one or two, three, and four or more. Id. According to the Regulations, if the degrees of limitation in the first three areas of function are found to be "none" or "mild," and if the degree of limitation in the fourth area of function is found to be "none", the ALJ will "generally conclude" that the mental impairment is "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

Here, the ALJ complied with the Appeals Council's directive to "further evaluate the claimant's mental impairment in accordance with the special technique described in 20 CFR 404.1520a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 303.1520a." Tr. 150. Utilizing the psychiatric review technique prescribed by 20 C.F.R. § 404.1520a, the ALJ thoroughly evaluated Claimant's mental impairment. With regard to the four broad functional areas set forth in 20 C.F.R. § 404.1520a(3), the ALJ found that Claimant has no more than: (1) a mild degree of limitation in maintaining activities of daily living; (2) no limitation in her ability to maintain social functioning; (3) a

19

mild degree of limitation in ability to maintain concentration, persistence, or pace; (4) and no episodes of decompensation. Tr. 32-33. Therefore, after applying the Regulations to these findings, the ALJ found that Claimant's mental impairment was "not severe." See 20 C.F.R. § 404.1520a(d)(1). The ALJ predicated his finding on credible evidence in the record.

The four exhibits upon which the parties – correctly or incorrectly – have focused their arguments concerning the severity of Claimant's mental impairment are 10F, 15F, 18F, and 19F:

- Exhibit 10F is a Psychiatric Review Technique Form completed by Dr. Silver on October 4, 2001, which clearly states that Claimant's mental impairment is non-severe, and in which Dr. Silver opined that Claimant has only mild or no limitations in all of the four functional areas described in 20 C.F.R. §404.1520a(c)(3). Tr. 392, 402;

- Exhibit 15F is a Physical Residual Functional Capacity Assessment completed by Dr. Jorge on October 30, 2002, which states that Claimant has some manipulative limitations but is able to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and that Claimant has no limitations in her ability to push and/or pull. Tr. 439, 441;

- Exhibit 18F is a Psychiatric Review Technique Form ("PRTF") completed by Dr. Figueredo on December 9, 2002, which states that Claimant has a mild limitation in activities of daily living and in maintaining social functioning, a moderate limitation in maintaining concentration, persistence, and pace, and no episodes of decompensation. Tr. 462; and

- Exhibit 19F is a Mental Residual Functional Capacity Assessment, also completed by Dr. Figueredo on December 9, 2002, which states that Claimant is not significantly limited in 17 of the 20 areas listed, but that she is moderately limited in the ability to carry out detailed instructions, in the ability to maintain attention and concentration for extended periods, and in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Tr. 466-68.

Claimant argues that the ALJ erred in finding her mental impairment to be non-severe because he mis-read or mis-interpreted the non-examining source opinions set out in Exhibits 18F and 19F. See Claimant's Motion at 5 (DE 20). Claimant argues that the PRTF authored by Dr. Figueredo, Exhibit 18F, shows that Claimant has a severe mental impairment because Dr. Figueredo did not check the box that says "Impairment Not Severe" (box B, 2). Tr. 452. Further, the undersigned notes that Dr. Figueredo found Claimant to have a "moderate" limitation in maintaining concentration, persistence, or pace, which, if credited, would require an ALJ to find that Claimant's mental impairment is severe. Tr. 462. At issue, therefore, is the propriety of the ALJ's finding that Claimant's limitation in concentration, persistence or pace is "mild," not "moderate."

In discussing the severity of Claimant's mental impairment, it is apparent that the ALJ mistakenly made reference to Exhibit 18F, rather than to Exhibit 10F, when he stated that "[i]n October 2001 it was determined that her mental impairment was non-severe . . . ." Tr. 32.[11] But it is clear that the ALJ chose not to accord substantial weight to Exhibit 18F, Dr. Figueredo's December 2002 opinion, which assigned a "moderate" limitation to concentration, persistence or pace. Tr. 32; 462. Instead, the ALJ accorded substantial weight to Exhibit 10F, Dr. Silver's October 2001 opinion, which assigned a "mild" limitation to concentration, persistence or pace, and which expressly stated that Claimant's mental

---

[11] The undersigned notes that although the ALJ suggests that both the October 2001 and December 2002 opinions indicate that Claimant has a moderate limitation in maintaining concentration, persistence or pace, only Dr. Figueredo's December 2002 opinion (Exhibit 18F) actually indicates such a moderate limitation. Tr. 32

21

impairment is non-severe.[12] Tr. 32 (finding "the opinion of October 2001 is consistent with the medical record as a whole, and thus it is given substantial weight"); see also Defendant's Response to Order Directing Supplemental Briefing (DE 29). Further, the ALJ noted that records indicate the Claimant has "good concentration and task persistence. She has the concentration necessary to take care of herself and her son, watch television, shop, cook and read." Tr. 33.

The ALJ's mistaken reference to Exhibit 18F, rather than to 10F, is "harmless error." An ALJ's misstatement is deemed harmless where the facts that the ALJ actually applies to reach a conclusion are appropriate and supported by the record. See Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (characterizing ALJ's apparent misstatement as "harmless error" where ALJ incorrectly stated that claimant was approaching "advanced age," rather than "retirement age," yet ALJ correctly applied claimant's vocational factors on section of grids for those approaching "retirement age"). Here, the ALJ properly relied upon the October 2001 opinion, which he should have referenced as Exhibit 10F, but mistakenly referenced as 18F, in finding Claimant's depression non-severe. Tr. 32, 392-405.

Further, although the ALJ did not give substantial weight to Dr. Figueredo's opinion in Exhibit 18F, he nonetheless did consider his findings. Tr. 32. He noted that a State Agency psychologist – Dr. Figueredo – in December 2002 had opined that Claimant had

---

[12] More specifically, in Exhibit 10F, Dr. Silver checked off the box that states "Impairment(s) Not Severe." Tr. 392. Dr. Silver opined that Claimant had mild restrictions of daily living and in maintaining concentration, persistence, or pace and no difficulties in maintaining social functioning nor any repeated episodes of decompensation. Tr. 402.

a "moderate limitation in maintaining concentration, persistence or pace . . . ." Tr. 32. Because the undersigned may not reweigh the evidence, the ALJ's decision to accord substantial weight to Dr. Silver's opinion in Exhibit 10F – finding a "mild" limitation in concentration – rather than to Dr. Figueredo's opinion in Exhibits 18F – finding a "moderate" limitation in concentration – must be upheld, as it is supported by substantial evidence in the record.

In addition to considering the opinions of the State Agency psychologists, the ALJ considered the results of Dr. Patel's psychiatric examination of November 16, 2002. Tr. 31-32, 446-48. According to Dr. Patel, Claimant denied any history of psychiatric hospitalization, suicide attempts, mania, psychosis or substance abuse, and she reported only periodic counseling for depression since the late 1980's. Tr. 31, 446-67. She was currently on Palemor for the preceding two years with fairly good results. Tr. 31, 447. Significantly, Dr. Patel noted that Claimant participated in a wide variety of activities. Tr. 31, 448. Moreover, Dr. Patel noted that Claimant had no difficulty concentrating, which lent further support to the ALJ's decision to credit Dr. Silver's October 2001 opinion (Ex. 10F) and to discount Dr. Figueredo's December 2002 opinion (Ex. 18F). Tr. 31, 448 (emphasis added). The ALJ, however, ultimately discounted Dr. Patel's diagnosis that Claimant's prognosis was guarded and that she suffered from current chronic major depression, as it was not consistent with other evidence in the record and was based on a one-time examination not reflecting her overall condition. Tr. 31.

The ALJ also considered the opinion of Dr. Barry Miller. On February 7, 2006, Dr. Miller completed a psychological questionnaire, in which he indicated that he had seen

Claimant in connection with her son's treatment and in the course of family therapy. Tr. 32, 622. Yet, as the ALJ correctly noted, Dr. Miller "stated that he could answer questions more definitively when [] [C]laimant has been formally evaluated." Tr. 32, 622-25. Thus, even though Dr. Miller diagnosed Claimant with major depression, his diagnosis was based on her medical records and was admittedly tentative. Tr. 622.

In sum, after conducting an independent review of the entire record, including the opinions of the State Agency psychologists, the ALJ arrived at a finding that Claimant was only mildly (as opposed to moderately) limited in her concentration, persistence, or pace and, therefore, that Claimant's mental impairment was non-severe. Tr. 32. Because his finding is supported by such evidence that a reasonable mind would accept as adequate, it cannot be disturbed.

### 2.    ALJ Properly Evaluated All Impairments in Combination

Claimant next argues that the ALJ erred in not considering Claimant's impairments in combination. Claimant's Motion at 10 (DE 20). Claimant alleges that the ALJ did not take her mental impairment or her carpal tunnel syndrome into consideration because he did not find them to be severe. Id. Although Claimant is correct that an ALJ must consider the combined effects of all impairments, whether severe or not, Claimant is incorrect in suggesting that the ALJ failed to do so. The ALJ expressly stated that "[C]laimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." Tr. 33 (emphasis added). Further, the ALJ stated that he had "considered all symptoms" and "also considered opinion evidence." Tr. 34 (emphasis

24

added).   Therefore, the ALJ clearly indicated that he considered all of Claimant's impairments and symptoms in combination in arriving at his findings, and Claimant has not offered any reason for this Court to conclude otherwise.

        3.     ALJ Gave Weight to Findings of State Agency Medical Consultants

Claimant argues that the ALJ erred in failing to explain the weight given to the opinions of the State Agency medical consultants.[13] See Claimant's Motion at 10-12 (DE 20). First, Claimant submits that the ALJ ignored a "Residual Physical Functional Capacity Assessment form (R. 466-469)." Claimant's Motion at 11 (DE 20). Yet, as the Commissioner notes, the form identified by Claimant that appears at pages 466-69 of the administrative record is not a Physical Residual Functional Capacity Assessment, as Claimant contends; rather, it is the previously discussed Mental Residual Functional Capacity Assessment completed by Dr. Figueredo in December 2002, Exhibit 19F. Defendant's Motion at 9-10 (DE 25).

Second, Claimant submits that the ALJ ignored another "Residual Physical Functional Capacity Assessment" appearing at pages 438-445. Claimant's Motion at 11 (DE 20). Here, Claimant is referring to Exhibit 15F, authored by Dr. Jorge in October 2002. Tr. 438-45. More specifically, Claimant submits that the ALJ failed to consider the handling and fingering limitations noted by Dr. Jorge. Tr. 441. The ALJ, however, did discuss Dr. Jorge's assessment. Tr. 40. The ALJ stated that the opinion of Dr. Jorge at

---

[13] SSR-96-6p states: "Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions."

Exhibit 15F reflected that Claimant was not precluded from performing light work activities. Tr. 40. According to the ALJ, Dr. Jorge's opinion was consistent with the medical evidence in the record as a whole, and the ALJ therefore decided to give the opinion substantial weight. Tr. 40. Although the ALJ did not expressly reference the manipulative limitations, Dr. Jorge did not indicate that these limitations would be of twelve months' duration. Tr. 438-45. Moreover, Dr. Jorge's assessment of Claimant occurred in October 2002, only a few months after Claimant's bilateral carpal tunnel surgeries. Tr. 73, 438. Subsequently, in November 2002, Claimant reported to Dr. Patel that she was independent in her personal hygiene, occasionally played games on the computer, and read. Tr. 36, 448. During that same month, Claimant told Dr. Coplowitz that she did light cooking, cleaning, and food shopping and could lift 10 to 20 pounds. Tr. 36, 449. Significantly, Dr. Coplowitz found that Claimant's manual dexterity was normal and that she had no difficulty turning the doorknob, grasping a pen, or handling change. Tr. 36, 450.

4.     ALJ Considered Non-Severe Impairments in Establishing Residual Functional Capacity

Finally, Claimant argues that the ALJ failed to consider her non-severe impairments in determining Claimant's residual functional capacity. Claimant's Motion at 12-13 (DE 20). This argument is essentially duplicative of Claimant's previous argument. In assessing a claimant's residual functional capacity, "the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR-96-8p. The ALJ thoroughly discussed Claimant's non-severe impairments – depression and carpal tunnel syndrome. Tr. 31-33. By finding that neither

constituted a severe impairment, he effectively found that neither significantly limited Claimant's ability to perform basic work activities. Tr. 30-33. Thus, the ALJ did evaluate Claimant's non-severe impairments before finding that Claimant had the capacity for a full range of light work activities. Tr. 30-41. And because substantial evidence supports the ALJ's finding that Claimant is capable of light work, she also is capable of returning to her past relevant work as a credit analyst and telephone customer service representative. Tr. 40.

## VI.   RECOMMENDATION

Claimant had a fair hearing and full administrative consideration in accordance with the applicable statutes and regulations. Although the ALJ did reference some exhibits by incorrect numbers, substantial evidence nonetheless supports his findings that Claimant's mental impairment is "not severe," that Claimant can perform light work, and that she can return to her past relevant work. Accordingly, the ALJ's conclusion that Claimant was not disabled during the relevant period should not be disturbed. The undersigned, therefore, respectfully RECOMMENDS that Claimant's Motion for Summary Judgment (DE 20) be DENIED, that Defendant's Motion for Summary Judgment with Supporting Memorandum of Law (DE 25) be GRANTED, and that the decision of the Commissioner be AFFIRMED.

The parties will have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable James I. Cohn, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the district court of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted

or adopted by the district court except upon grounds of plain error or manifest injustice.

See 28 U.S.C. § 636(b)(1); Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir. Unit B 1982)

(en banc).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 15th day of August 2008.


BARRY S. SELTZER
United States Magistrate Judge


Copies to:

Honorable James I. Cohn
United States District Judge

Victor Mantel, Esq.
2020 N.E. 163rd Street, Suite 206
N. Miami Beach, Florida   33162
Attorney for Plaintiff Christine W. Troop

Ana Maria Martinez, Esq.
Assistant United States Attorney
United States Attorney's Office
99 NE 4th Street, Suite 300
Miami, Florida   33132

C. Geraldine Umphenour, Esq.
Assistant Regional Counsel
Social Security Administration
Office of the Regional Chief Counsel
605 E. 12th Street, Suite 535
Kansas City, Missouri   64106